**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ELIZABETH KINOWSKI,

       Plaintiff,

         v.

THE HOME FOR ELDERLY WOMEN
OF MONTGOMERY COUNTY, INC.
(A/K/A SARAH JANE SANFORD HOME),

       Defendant.

**Civ. Act. No.:**
**1:22-cv-1342 (BKS/DJS)**

**VERIFIED COMPLAINT**

**For a Verified Complaint, Elizabeth Kinowski alleges as follows:**

**INTRODUCTION**

1. The Sarah Jane Sanford Home fired its Administrator Elizabeth Kinowski because she expressed her sincerely held religious beliefs regarding obtaining a Covid-19 vaccine and made a request for a religious exemption.[1]

2. Shortly after Kinowski made the request for a religious exemption on August 24, 2021, the Home decided to find a way to fire Kinowski. Immediately, the Board of Trustees President Kris Singh proceeded to shun Kinowski, treat her coldly and began excluding her from necessary meetings with the Board of Trustees that Kinowski

---

[1] The Home is an adult home for people 65 and over. As Administrator of the Home, Kinowski was in charge of all day to day operations of the Home and creation and implementation of the Home's policies; Kinowski was in charge of all Home employees and responsible for all Home residents. Kinowski was only subject to the Board of Trustees and the Board of Lady Managers – the two Boards overseeing the Home. The Board of Trustees was responsible for hiring, firing, and imposing any discipline upon the Administrator, among other duties.

normally arranged, conducted and led.  The Home then hired a "consultant" in September 2021 to furtively interview Home employees and residents regarding Kinowski in an effort to deliberately solicit complaints about Kinowski.  The following month, in October 2021, the Home hired a law firm to issue an "investigative report" regarding the alleged complaints solicited by the consultant.  Then, on October 29, 2021, the Home summarily terminated Kinowski.  In their rationale for firing Kinowski, the Home made no mention that they were firing her because of her religious beliefs or because she objected to receiving the Covid-19 vaccine.  Rather the Home stated that Kinowski "created an environment where residents do not feel safe, comfortable, respected or cared for in their own home."

3. Exemplary of the pretextual nature of the Home's investigation and termination of Kinowski, the investigative report omits dates, times, and sources of the alleged information. The Home intentionally failed to gather evidence in defense of Kinowski and refused to even interview Kinowski regarding the alleged complaints.  The Home then bypassed any kind of intermediate action like warning, reprimanding, or disciplining Kinowski.  They simply fired her.

4. Prior to the Home's investigation into Kinowski, no resident, employee or anyone else had ever made a complaint about Kinowski, nor had the Home ever disciplined her for any reason. Indeed, Kinowski had served as the Home's Administrator with distinction during her four year tenure.  In fact, just a few months prior to Kinowski making a request for a religious exemption and the Home commencing its investigation, the Home gave Kinowski a substantial $15,000 raise and $15,000 bonus, respectively. Shortly thereafter, she also appeared at the Hero's Award Ceremony in Amsterdam, New

York to accept an award on behalf of the Home for its outstanding response to the Covid-19 pandemic, which Kinowski led.

5. The reason the Home went through the pains it did to fire an at-will employee like Kinowski was because the Home needed adequate cover for their discriminatory and retaliatory animus. Hon. Kerry Mierzwa, an ALJ for the New York State Unemployment Insurance Appeal Board, issued a written decision granting Kinowski unemployment benefits after a full hearing regarding the circumstances that led to the Home firing Kinowski. Judge Mierzwa cast doubt on the Home's claimed reasons for firing Kinowski: "I find it significant that the administrator worked there for four years, and the Board [of Trustees] now alleges that all of this behavior occurred under their supervision (for years) … The employer (WS) [Board Member William Sikora] acknowledged they did not verify any of the information in the report, and not address any of the issues with the claimant prior to discharging her. Moreover, it is undisputed that there were no complaints for years about the claimant and that the Board gave her bonuses and raises for her work. Under these circumstances, the claimant's actions were not so egregious as to rise to the level of misconduct and her employment ended under non-disqualifying circumstances" (ellipses and brackets added).

6. As a result of the Home's unlawful termination of Kinowski, Kinowski has lost her salary, employment benefits, and the hope to someday retire from the job that she loved with a pension and benefits.  Moreover, she has suffered humiliation, embarrassment, and emotional distress for being surreptitiously investigated and fired by the Home for her religious beliefs.

3

7. Kinowski therefore brings this action against the Home for employment discrimination due to religion and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Section 296(1) (a) and (e) of the New York Executive Law (hereinafter "Human Rights Law").

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over Kinowski's claims pursuant 28 U.S.C. § 1331 in that this action arises under federal law.

9. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

10. Venue is proper in the Northern District of New York under 28 U.S.C. §1391, because Defendant is a duly licensed domestic not-for profit corporation located in the Northern District of New York.

## PARTIES

11. Plaintiff Elizabeth Kinowski ("Kinowski"), was employed by the Sarah Jane Sanford Home as its chief Administrator for four years from October 2017 to October 2021.  Kinowski is a practicing Roman-Catholic.

12. Kinowski resides at 2 Fowler Street, Hagaman, NY 12086, in the County of Montgomery.

13. The Home for Elderly Women of Montgomery County, Inc., A/K/A Sarah Jane Sanford Home (the "Home") is a domestic not-for-profit corporation organized and existing under the laws of New York State with over fifteen  employees; and as such is a covered employer under state and federal anti-discrimination laws (reference to the "Home" throughout this Verified Complaint is inclusive of the Home as an entire

4

corporate entity, including the Board of Trustees and Board of Lady Managers, which are the Boards that oversee the Home).

14. The Home has its principal office and location at 69 Guy Park Avenue, Amsterdam, NY 12010, in the County of Montgomery.

15. The corporate structure of the Home includes two Boards: the Board of Trustees (sometimes referred to as the "Board") and the Board of Lady Managers (collectively, the "Boards").

16. Upon information and belief, the Board of Trustees includes a president, vice president, secretary, treasurer, and five trustees and is responsible for overseeing the Home's fiscal situation and is charged with the duty of hiring and firing the Administrator as well as imposing any discipline upon the Administrator.

17. Upon information and belief, the Board of Lady Managers is responsible for overseeing and planning parties and celebrations that take place at the Home.

## FACTS
### A. Kinowski was an excellent Administrator and employee of the Home.

18. On or about October 23, 2017, the Home hired Kinowski to be the Administrator of the Home.

19. As Administrator, Kinowski was in charge of all Home employees numbering approximately 30.

20. Kinowski was responsible for all Home residents numbering between 22-40 during her tenure, with the Home having a 40 bed maximum capacity.

21. Moreover, Kinowski was responsible for running the Home's day to day operations; promulgating and implementing Home policies; assisting in the care of

residents; and meeting with and advising the Boards on various matters regarding the Home, among other duties.

22. Upon information and belief, as Administrator, Kinowski, under the Home's bylaws, was solely responsible for making and implementing Home policy.

23. Kinowski was an excellent choice to serve as Administrator for many reasons.

24. At the time of her hiring, Kinowski had been a registered nurse for approximately 30 years.

25. As a registered nurse, Kinowski worked extensively in geriatrics, surgery, and labor and delivery.

26. For the approximate 19 years leading up to taking the position as the Home's Administrator, Kinowski worked for Liberty Arc in Amsterdam, NY caring for mentally and physically disabled adults.  For her last decade with Liberty Arc, Kinowski served as a nursing supervisor where she was in charge of at least eight, and up to 15, nurses.

27. At all times prior to August 2021 (the time when Kinowski requested a religious exemption from the Covid-19 vaccine requirement), the Home viewed Kinowski as an excellent Administrator.

28. In fact, at the end of March 2021 the Home rewarded Kinowski with a $15,000 raise and a $15,000 bonus, respectively.

29.   At all times prior to August 2021, various members of the Boards, including Board of Trustees President Kris Singh ("Singh"), periodically acknowledged Kinowski's excellent job performance.

30. Emblematic of Kinowski's dedication and on the job excellence, in July 2021 Kinowski attended the Heroes' Awards ceremony in Amsterdam, NY where Kinowski

6

accepted an award on behalf of the Home for its service to the community during the Covid-19 pandemic.

31. In May 2020 and again in December 2020 the New York State Department of Health surveyed the Home's Covid-19 protocol.

32. On both occasions the Department of Health awarded the Home perfect scores as a result of these surveys.

33. Kinowski, as Home Administrator, was largely responsible for the success of these surveys.

34. Indeed, Kinowski as the Administrator was largely responsible for leading the Home's response to the Covid-19 pandemic.

35. At no time did the Home ever discipline, counsel, or censure Kinowski in any way for poor job performance, misconduct, or any other violation of her duties or responsibilities.

36. At no time did any resident, resident's family member, or employee ever make a complaint about Kinowski to the Home.

37. The only "discipline" Kinowski ever received was when she was terminated by the Home in October 2021, as discussed below.

### B. Kinowski is a practicing Roman Catholic and so therefore is required to follow her sure judgment in conscience.

38. Kinowski has been a practicing Catholic her entire life.

39. Kinowski is a baptized Catholic and has received all of the Sacraments offered by the Church.

7

40. Kinowski attends Mass at least every Sunday and Holy Day of Obligation and engages in religious practices including daily prayer, meditation, scripture reading, and studying the teachings of the Catholic Church.

41. The Roman Catholic Church teaches that if a person comes to the sure judgment in conscience, that person must follow that judgment.

42. The Catholic faith teaches that a person is morally required to obey his or her sure conscience and commits sin by disobeying it.

43. "A human being must always obey the certain judgment of his conscience. If he were deliberately to act against it, he would condemn himself" (Catechism of the Catholic Church, Vatican City: Libreria Editrice Vaticana, 1993, www.vatican.va, n. 1790).

44. The Catholic Church teaches that "sin is an offense against reason, truth, and right conscience" (Catechism of the Catholic Church, n. 1849).

45. "Conscience is the most secret core and sanctuary of a man. There he is alone with God, Whose voice echoes in his depths. In a wonderful manner conscience reveals that law which is fulfilled by love of God and neighbor" (Second Vatican Council, Pastoral Constitution on the Church in the Modern World, Gaudium et spes, October 7, 1965, www.vatican.va, n. 16).

46. Because the Catholic faith requires individuals to follow their consciences, it would be sinful for a person to receive a vaccine in violation of their sure judgment in conscience.

8

47. While the Catholic Church does not universally prohibit the use of any vaccine, the authoritative Church teachings demonstrate the principled religious basis on which a Catholic may discern that God's will for him or her is to refuse certain vaccines.

48. These are some of the essential teachings that inspired and informed Kinowski in her choice to refuse to receive a Covid-19 vaccine.

49. These are some of the essential teachings that inspired and informed Kinowski in making her request for a religious exemption from the Covid-19 vaccine requirement.

50. These are some of the essential teachings that Kinowski relied on in making her request for a religious exemption from the Covid-19 vaccine requirement.

**C. Kinowski requests a religious exemption from the Covid-19 vaccine requirement.**

51. Upon information and belief, in August 2021, the New York State Department of Health advised that it would be adopting regulations that required employees of adult homes to obtain a Covid- 19 vaccine, with the regulations going into effect on or about August 26, 2021.

52. This regulation affected employees of the Home, including Kinowski.

53. After receiving this information, Kinowski arranged a meeting with members of the Board of Trustees to discuss the Home's response to these regulations.

54. Kinowski scheduled the meeting for August 24, 2021 at the Raindancer Restaurant in Amsterdam, NY.

55. All of the Board of Trustees members attended the meeting.

56. At this meeting, Kinowski informed the Board of the State's promulgated policy and stated she wished to adopt Home policies that allowed employees to request exemptions, including religious exemptions.

9

57. Kinowski also advised the Board that she would like to submit a request for a religious exemption herself and stated her reasons for requesting the exemption.

58. Kinowski stated in sum and substance that receiving a Covid-19 vaccine would violate her deeply held religious beliefs and her conscience.

59. After stating her reasons for requesting a religious exemption, Kinowski attempted to hand in her written exemption request to Board President Kris Singh.

60. Singh declined to receive Kinowski's written religious exemption request and said he did not want "to look at it right now."

61. Singh and other members of the Board at the meeting had full knowledge that the written request Kinowski attempted to hand-in during the meeting was her request for a religious exemption.

62. The Board did not directly comment on Kinowski's statements regarding the adoption of a policy for employees to request religious exemptions.

63. The Board did not directly comment on Kinowski's statements regarding her reasons for requesting a religious exemption.

64. After the meeting, Singh's behavior toward Kinowski changed markedly.

65. At all times prior to the meeting on August 24, 2021, Singh and all other members of the Board of Trustees treated Kinowski amiably, with respect and professionalism.

66. After the meeting, Singh began to act bitterly, coldly and curtly towards Kinowski.

67. Singh and other members of the Board of Trustees proceeded to deliberately exclude Kinowski from multiple necessary meetings with the Board that Kinowski had always attended.

10

68. Indeed, up until Kinowski had made a request for a religious exemption on August 24, all Board meetings were planned, arranged and conducted by Kinowski.

69. In direct response to Kinowski requesting a religious exemption at the meeting and stating her religious reasons for requesting the exemption, Singh and other members of the Board began to plan how they would terminate Kinowski.

70. Singh and other members of the Board did this in direct retaliation for Kinowski requesting a religious exemption and in discrimination of her religious beliefs.

**D. Kinowski leads the Home's effort in responding to the Covid-19 pandemic and the Vaccine requirement.**

71. Since the inception of the Covid-19 pandemic in March 2020, Kinowski led the Home's response to the pandemic and did so with great success, some of which is examined in supra section "A".

72. Kinowski's efforts in spearheading the Home's response to the pandemic continued after the August 24, 2021 meeting as well.

73. On or about September 1, 2021, Kinowski advised all Home employees about the New York State Department of Health's policy regarding the Covid-19 vaccine requirement.

74. Subsequently, a number of Home employees made requests for exemptions, including religious exemptions.

75. Within just a handful of days, Kinowski received approximately 15 requests from employees for religious exemptions from the Covid-19 vaccine requirement.

76. Kinowski therefore arranged another meeting with members of the Board of Trustees to discuss the influx of requests for exemptions and how the Home would respond to this situation.

11

77. On or about September 3, 2021, Kinowski met with Singh and Board member William Sikora, along with Kinowski's administrative assistant Sherri Winnie.

78. Kinowski at that time advised Singh and Sikora that a number of employees requested a religious exemption.

79. Kinowski offered to hand the hard copy written requests for religious exemptions to Singh during the meeting – numbering about 15 in total.

80. Singh, however, declined and would not receive the requests from Kinowski.

81. Kinowski also asked Singh about whether the Home should consider writing to elected representatives about the Department of Health's vaccine requirement, given the number of employees who were requesting exemptions from the mandate.

82. Singh responded to Kinowski's query stating "we'll do nothing of the kind."

83. Singh further added that it was a "unanimous decision" of the Board of Trustees to not write any elected representatives.

84. This was the first time that Kinowski had raised the issue of writing elected representatives regarding the vaccine mandate.

85. Upon information and belief, no person had raised with Singh or the Board of Trustees the possibility of writing elected representatives regarding the Covid-19 vaccine mandate prior to Kinowski raising it.

86. Kinowski, incredulous, asked Singh expressly if all nine members of the Board of Trustees voted against this proposition.

87. Singh remained silent and would not answer.

88. Kinowski repeated her question and Singh qualified his previous answer by stating that only the "executive members" of the Board voted against the proposition and not the entire Board.

89. Singh then changed topics and asked Kinowski to find a medical professional familiar with the Covid-19 vaccines to come in and educate staff about the vaccines.

90. Kinowski agreed.

91. Shortly after the meeting Kinowski hired Dr. Dianna Galish-Frasier for the assignment.

92. Kinowski then notified Singh about who she decided to hire and Singh approved of Kinowski's decision.

93. Singh and no other members of the Board of Trustees expressed any interest or asked to attend the informational Covid-19 vaccine session to be presented by Dr. Galish-Frasier.

94. Galish-Frasier came into the Home on or about September 15, 2021 to discuss the vaccine with the employees.

95. Approximately ten employees, including Kinowski, attended the informational presentation.

96. No member of the Board of Trustees attended the presentation.

97. At all times Kinowski used her best efforts to continue to implement policies to adequately respond to Covid -19.

98. At all times, Kinowski used her best efforts to make and implement policies that complied with all state law and regulations regarding Covid-19 and Covid-19 vaccine requirements.

99. At no time did Singh or any other members of the Board counsel, censure, or discipline Kinowski for anything related to job performance or the making and implementation of policies.

100. At no time did Kinowski fail to follow any instruction given to her by Singh or other members of the Board.

101. The Board of Trustees were in fact mostly uninvolved in the day to day operations of the Home.

102. The Board of Trustees were mostly uninvolved with making policy for the Home because this was the province of the Home Administrator.

**E. The Home hires consultant Jeanne So to investigate and manufacture a case against Kinowski for alleged misconduct.**

103. On or about the morning of September 7, 2021 a fellow employee advised Kinowski about a conversation overheard the day before where a Board of Trustees member was discussing with a Home resident that the Board had found a "replacement" for Kinowski.

104. Concerned, Kinowski later that day on or about September 7 spoke with Board of Trustees Treasurer Ben Ziskin about this information.

105. Ziskin responded that it is true that the Board of Trustees hired someone, but not as Kinowski's replacement; rather, according to Ziskin, the person was hired as a "consultant" and "Covid coordinator": Jeanne So.

106. Later on or about September 7, 2021 Singh confirmed to Kinowski what Ziskin reported to her.

107. At no time did any member of the Board inform Kinowski that they were considering hiring a consultant or Covid coordinator for the Home.

14

108. For Kinowski's entire career prior to the Board hiring Jeanne So in September 2021, the Board never acted unilaterally or without Kinowski's input and knowledge regarding the hiring of any consultant to the Home.

109. In fact, other than hiring So as the purported Covid coordinator, the Home had never hired a consultant during Kinowski's tenure for anything.

110. Indeed, prior to the Board hiring So, Kinowski had been the person primarily responsible for hiring employees and consultants.

111. Although the Board may vote to approve the hiring of a consultant it would have never acted unilaterally and certainly not without Kinowski's knowledge or input.

112. Kris Singh and the Board deliberately excluded Kinowski from the conversations and meetings to discuss hiring a consultant because they wished to deploy the consultant to investigate Kinowski and manufacture a case against her so they could terminate her in retaliation for Kinowski requesting a religious exemption and in discrimination of her sincerely held religious beliefs.

113. On or about September 7 or 8, 2021, Singh told Kinowski that So was not Kinowski's replacement.

114. In that same conversation, Singh told Kinowski that the Home was not terminating Kinowski.

115. So began her duties as a consultant on or about September 9 or 10.

116. Regarding So's history with the Home, So was the direct predecessor of Kinowski as Home Administrator.

117. In 2017 and the beginning of 2018, for the first several months of Kinowski's tenure as Administrator, So stayed on the Home staff to provide Kinowski on the job training and to assist in the change of Administration.

118. So remained officially on the Home staff until about February 2018, prior to being hired by the Home as a consultant and "Covid coordinator " in September 2021.

119. So had no special expertise in infectious disease.

120. So had no special expertise with Covid-19.

121. So had no credentials that qualified her to be a "Covid coordinator."

122. So was not specially qualified above or beyond Kinowski to implement policies related to Covid-19 or Covid-19 vaccination requirements.

123. After So started as a consultant on or about September 9, 2021, So began giving the Home employees orders as well as attempting to directly implement Covid policies for the Home.

124. For example, So restricted unvaccinated employees from using the employee break room and required unvaccinated employees to use the hair salon for their lunch breaks.

125. So erected signs in the Home communicating some of her new rules.

126. So never consulted with Kinowski about the rules she was implementing in the Home.

127. As such, on or about September 15, 2021, Kinowski asked So to pass any changes she wanted to make to the Home's rules and operations through her first.

128. So responded to Kinowski stating that she did not have to advise her of any of this and could institute changes without her approval.

16

129. On or about September 16, 2021, Kinowski met with Singh about So's conduct.

130. During the meeting, Kinowski informed Singh that So was acting unilaterally in implementing Home rules and policies and without advising Kinowski first.

131. Singh responded to Kinowski's complaint by telling her that she and So "are equals."

132. Upon information and belief, Singh intended to convey to Kinowski that he believed Kinowski and So had equal authority with respect to their responsibilities and duties and abilities to implement policies for the Home.

133. Other than Singh's say so, there was no written policy or document approved of by the Board of Trustees or anyone else that bestowed authority on So that was equal to the Administrator of the Home.

134. Rather, the Memorandum issued by Singh on behalf of the Board of Trustees dated September 20, 2021 set forth So's role as to "implement the Policy," namely the "COVID-19 Vaccination Policy… ."  The memorandum also states that So would be "taking all direction from the Board of Trustees."

135. The Home's stated Covid-19 vaccination policy required all employees to receive a Covid-19 vaccine, without allowing for religious exemptions.

136. The memorandum added that it would not be enforcing the part of the New York State regulation that barred religious exemptions and that the Home "may not refuse to accept a request for a religious exemption at this time."

137. Although Singh's Memorandum conferred the duty of implementing the Home's "COVID-19 Vaccination Policy" upon So, upon information and belief the job

17

description for Administrator provided that the duty to make and implement Home policy rested with the Administrator.

138. The Board violated and acted inconsistent with the established job description for Administrator by granting the authority to implement policy to So.

139. The Board granted So the authority to implement Home policy, intentionally without conferring with Kinowski.

140. Throughout the month of September and into October 2021, So proceeded to gather information about Kinowski, deliberately doing so without Kinowski's knowledge.

141. So conducted an investigation into Kinowski with the pre-determined purpose of concocting a case of misconduct against Kinowski.

142. So's investigation was conducted at the express direction of members of the Board, including Singh.

143. Singh and the other members of the Board ordered So to investigate Kinowski with the intention of firing Kinowski in retaliation for requesting a religious exemption and in discrimination of her religious beliefs.

144. With respect to So's investigation, So asked residents what their opinions were of Kinowski, how Kinowski treated them, and whether they felt comfortable around Kinowski, among other questions

145. So did this with the intention of soliciting complaints from residents about Kinowski.

146. Up to this point, no residents had ever made any complaints about Kinowski.

147. So called family members of residents also inquiring about Kinowski's conduct.

18

148. So did this with the intention of soliciting complaints from residents' family members about Kinowski.

149. Up to this point, no family members of residents had ever made any complaints about Kinowski.

150. So inquired of the Home's Human Resources office about Kinowski's time sheets, how much time she had taken off and whether she had any pattern of being late for work.

151. Kinowski had no pattern of being late for work and had never violated the Home's time off policy.

152. So inquired of Home employees about Kinowski's conduct at work.

153. So did this with the intention of soliciting complaints from Home employees about Kinowski.

154. Up to this point, no employee had ever made a complaint about Kinowski to anyone.

155. Neither the Board nor So ever informed Kinowski that she was being investigated by So.

### F. Kinowski makes a second request for a religious exemption; the Board hires a law firm to rubber stamp Jeanne So's investigation; the Home fires Kinowski.

156. On or about September 8, 2021, Kinowski emailed Singh and attached a copy of her religious exemption request that Singh had declined to receive during the August 24 meeting at the Raindancer Restaurant.

157. In a statement dated October 7, 2021, So advised Kinowski that the Board had "accepted" her request for a religious exemption "pending the outcome of federal litigation" and "subject to the review and approval by the Board of Trustees… ."

158. The written statement accepting Kinowski's request for a religious exemption was from the Board of Trustees, but signed by So.

159. Furthermore, in an email dated September 8, 2021 Singh asked Kinowski to provide him with "copies of our bylaws, the officers and directors' insurance policy and employment contracts for all employees."

160. On or about October 12, 2021, the Board hired Lippes Matthias LLP (the "law firm").

161. The Board hired the law firm purportedly to conduct its own investigation of Kinowski.

162. Upon information and belief, the law firm conducted little to no independent investigation outside of the purported information gathered by So.

163. The Board in truth did not hire the law firm to conduct its own independent and impartial investigation into the alleged complaints made about Kinowski.

164. Rather, the Home hired the law firm to rubberstamp So's findings and place them in its own "investigative report."

165. The Board hired the law firm to produce an investigative report so when the Home fired Kinowski it did so with the appearance of propriety while veiling their discriminatory and retaliatory animus for Kinowski.

20

166. Upon information and belief, the Home had never hired a law firm to perform an investigation into any employee of the Home prior to in or around October 2021 when it hired the law firm to purportedly investigate Kinowski.

167. On or about October 19, 2021, Kris Singh called Kinowski asking to meet with her at 5:00pm, which Kinowski agreed to.

168. Singh showed up to the Home at approximately 1:40pm along with Board of Trustees members William Sikora and Don Wilson, as well as Kathy Parry and Paula Philips, the co-presidents of the Board of Lady Managers.

169. Singh told Kinowski at that time that he was placing her on administrative leave with pay as the Home was having an investigation conducted into her as a result of some alleged "complaints" being made about Kinowski.

170. Kinowski asked Singh if she would have an opportunity to be interviewed during the course of the investigation.

171. Singh replied that Kinowski would be interviewed.

172. The "complaints" referenced by Singh regarded information solicited by So during the course of So's interviews attempting to solicit complaints about Kinowski.

173. The law firm claims that it commenced its investigation into the alleged complaints on or about October 22, 2021.

174. The law firm's claimed investigation culminated in an "investigative report" dated November 3, 2021.

175. At no time during the course of the law firm's claimed investigation was Kinowski interviewed or given an opportunity to respond to the alleged claims being made about her.

21

176. The law firm's investigative report claims Kinowski had engaged in poor behavior while the Administrator of the Home for years.

177. The investigative report in almost all instances fails to identify specific dates or even general time frames when the alleged incidences of poor behavior and/or misconduct took place.

178. The persons who served as alleged sources of information in the investigative report are kept anonymous.

179. The investigative report does not mention any time prior to the law firm's claimed investigation when any employee, resident, or resident's family member ever made a complaint to the Home about Kinowski.

180. The investigative report does not mention any time when Kinowski was disciplined, warned, or censured for any of the alleged poor behavior discussed in the report.

181. The investigative report says nothing about Kinowski failing to be subordinate or follow the directives of the Board.

182. The investigative report made no finding regarding Kinowski's performance in implementing policies regarding Covid-19.

183. The investigative report says nothing about whether Kinowski herself was in compliance with the Covid-19 vaccine requirement.

184. All of investigative report's purported facts alleging poor behavior engaged in by Kinowski are either completely false or partially false.

185. The investigative report recommended that the Board immediately terminate Kinowski.

186. The investigative report is dated November 3, 2021.

187. The Board fired Kinowski on October 29, 2021.

188. The Board never reviewed the law firm's investigative report prior to firing Kinowski.

189. Indeed, the investigative report had not even been completed prior to the Home terminating Kinowski.

190. On or about May 31, 2022, seven months after the Home fired Kinowski, Board member William Sikora appeared at a hearing in front of the New York State Unemployment Insurance Appeal Board regarding Kinowski's application for unemployment benefits and testified that he had never reviewed the investigative report.

191. In Kinowski's termination letter dated October 29, 2021, the Board stated that it was terminating Kinowski based on "information provided to the Boards by many residents and their families" which has "created an environment where residents do not feel safe, comfortable, respected or cared for in their own home."

192. Singh and other members of the Board adopted the alleged facts and findings communicated to them by So.

193. Singh and other members of the Board adopted the alleged facts and findings communicated to them by the law firm.

194. Singh and other members of the Board deliberately failed to hear or consider any facts or evidence in Kinowski's defense.

195. Still, nothing cited by the Home or contained in the investigative report, even if true, warranted immediate termination of Kinowski.

23

196. In fact, upon information and belief, the Home's policy, for most forms of employee misconduct, requires that the violating employee be confronted by their supervisor with the alleged infraction and that the employee be given notice of the discipline to be imposed.

197. Upon information and belief, only after three warnings, again for most forms of misconduct, can an employee be fired according to the Home's policy.

198. Although the allegations made against Kinowski in the report purportedly happened at various times during her four year tenure, she was never confronted with any alleged infraction; was never disciplined for any alleged infraction; and was never given a warning for any alleged infraction.

199. Upon information and belief, the Home did not terminate any employee, other than Kinowski, for requesting a religious exemption from the Covid-19 vaccine requirement.

200. Indeed, the Home employees who initially put in a request for religious exemption from the vaccine requirement either resigned or otherwise capitulated in getting the vaccine.

201. Kinowski would not capitulate in obtaining a Covid-19 vaccine given her religious convictions.

202. Singh and other members of the Board reasonably believed that Kinowski would not capitulate in receiving a Covid-19 vaccine given her stated religious convictions on August 24, 2021.

203. As such, Singh and other members of the Board chose to find a way to fire Kinowski while cloaking the true reason for the termination.

24

204. Singh's and other members of the Board's directives to have Kinowski investigated as well as the Home's ultimate firing of Kinowski was done to intentionally and willfully discriminate against Kinowski for her religious beliefs.

205. Singh's and other members of the Board's directives to have Kinowski investigated as well as the Home's ultimate firing of Kinowski was in retaliation against Kinowski for engaging in a protected activity, namely requesting a religious exemption.

### G. New York State Unemployment Insurance Appeal Board grants Kinowski unemployment benefits and criticizes the Home's termination of Kinowski.

206. After the Home terminated Kinowski, Kinowski applied for unemployment benefits to the New York State Department of Labor in or around November 2021.

207. The Home opposed Kinowski's application.

208. The Department of Labor initially denied Kinowski's application in or around January 2022.

209. Kinowski timely appealed this decision.

210. The New York State Unemployment Insurance Appeal Board took up Kinowski's appeal and conducted an evidentiary hearing by phone on or about May 31, 2022.

211. Kinowski appeared pro se representing herself.

212. So and William Sikora appeared on behalf of the Home and were represented by counsel for the Home.

213. The New York State Unemployment Insurance Appeal Board considered all of the facts and evidence offered by Kinowski and by the Home.

214. Based on this, the Appeal Board made a decision to grant Kinowski unemployment benefits, reversing the prior decision that denied Kinowski unemployment benefits.

215. In her written decision on behalf of the Appeal Board, Hon. Kerry Mierzwa, ALJ, held that Kinowski's "actions were not so egregious as to rise to the level of misconduct and her employment ended under non-disqualifying circumstances."

216. Indeed, Judge Mierzwa's decision on Kinowski's unemployment case criticized the investigation report produced by the law firm the Home hired as well as the Home's stated reasons for firing Kinowski.

217. Judge Mierzwa held "I find it significant that the administrator worked there for four years, and the Board now alleges that all of this behavior occurred under their supervision (for years) … The employer (WS) [William Sikora] acknowledged they did not verify any of the information in the report, and not address any of the issues with the claimant prior to discharging her. Moreover, it is undisputed that there were no complaints for years about the claimant and that the Board gave her bonuses and raises for her work" (ellipses and brackets added).

218. A reasonable inference based on the facts contained herein, and one in which the Court should make, is that the Home's hiring of So as a claimed "consultant" and "Covid coordinator", hiring of the law firm to investigate "complaints" being made about Kinowski, and the Home's summary termination of Kinowski was pretextual and part of a scheme to fire Kinowski because of her religious beliefs and in retaliation for requesting a religious exemption.

26

**H.  Exhaustion of Administrative Remedies.**

219. On or about March 29, 2022, Plaintiff timely filed with the EEOC a charge of discrimination against the Home, Charge No.: 525-2022-00420, alleging discrimination and retaliation in violation of federal and state laws.

220. By Dismissal and Notice of Rights dated September 16, 2022, which was received by Plaintiff on or about September 16, 2022, Plaintiff was notified by the EEOC of her right to file a civil action against Defendant (EEOC Discrimination and Notice of Rights attached hereto as **Exhibit A**).

221. This action has been timely filed within ninety (90) days of Plaintiff's receipt of the aforesaid right to sue letter.

## FIRST CAUSE OF ACTION

*Unlawful Discrimination on the basis of Religion in Violation of Title VII*

222. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint as if set forth in full.

223.  Defendant's conduct as herein alleged violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a)(1), which makes unlawful, discrimination against an employee on the basis of religion. The term "religion" includes "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e(j).

224. Defendant's actions, policy and practice constitute an impermissible consideration of religion under 42 U.S.C. § 2000e-2(m) because, among other things, Plaintiff's religion, sincerely held religious faith, religious exercise and/or religious practices were a motivating factor in Defendant's conduct.

27

225.  Defendant discriminated against Plaintiff in violation of Title VII when, among other things, in direct response to and substantially motivated by Kinowski having expressed her sincerely held religious beliefs, Defendant planned to terminate Kinowski; to achieve this end, Defendant hired a consultant to manufacture and create a case against Kinowski for alleged misconduct; Defendant then hired a law firm to adopt and sign off on the consultant's findings doing all of this in an effort to cover up Defendant's discriminatory animus; and then Defendant summarily fired Kinowski ostensibly relying on the consultant's findings and the law firm's investigative report.

226.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to hide the Defendant's discriminatory animus.

227.  As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered and continues to suffer, among other things, the loss of her rights, mental anguish, loss of salary and employment benefits, emotional distress and humiliation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

228.  Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

229.  Plaintiff requests relief as described in the Prayer for Relief below.

## SECOND CAUSE OF ACTION

*Unlawful Discrimination on the basis of Reprisal for Engaging in Protected Activities in Violation of Title VII*

230.  Plaintiff repeats and realleges each and every previous allegation contained in this Complaint as if set forth in full.

28

231. The Defendant's conduct as herein alleged violates Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer to retaliate against an employee because she engaged in activities protected by Title VII.

232. Defendant retaliated against Plaintiff in violation of Title VII when, among other things, in direct response to and substantially motivated by Kinowski having requested a religious exemption from the Covid-19 vaccine requirement, Defendant planned to terminate Kinowski; to achieve this end, Defendant hired a consultant to manufacture and create a case against Kinowski for alleged misconduct; Defendant then hired a law firm to adopt and sign off on the consultant's findings doing all of this in an effort to cover up Defendant's discriminatory and retaliatory animus; and then Defendant summarily fired Kinowski ostensibly relying on the consultant's findings and the law firm's investigative report.

233. The stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to conceal the Defendant's discriminatory and retaliatory animus.

234. As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered and continues to suffer, among other things, the loss of her rights, loss of salary and employment benefits, mental anguish, emotional distress and humiliation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

235. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

236. Plaintiff requests relief as described in the Prayer for Relief below.

**THIRD CAUSE OF ACTION**

*Unlawful Discrimination on the Basis of Disparate Treatment on the Basis of Religion in Violation of Title VII*

237.  Plaintiff repeats and realleges each and every previous allegation contained in this Complaint as if set forth in full.

238.  The Defendant's conduct as herein alleged violates Title VII of the Civil Rights Act of 1964, which makes it unlawful for an employer to discriminate against an employee because of her religion. Defendant discriminated against Plaintiff when, among other things, it treated her differently than other employees who did not express a sincerely held religious belief that prohibited them from receiving a Covid-19 vaccine. Namely, Defendant treated Plaintiff differently by deploying a consultant to conduct a surreptitious investigation into Plaintiff for alleged misconduct and predetermining her fate to be termination. Employees who initially requested a religious exemption from the Covid-19 vaccine requirement were not investigated and terminated like Kinowski because said employees either resigned or capitulated with respect to receiving a Covid-19 vaccine.

239.  The stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to conceal the Defendant's discriminatory and retaliatory animus.

240.  As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered and continues to suffer, among other things, the loss of her rights, loss of salary and employment benefits, mental anguish, emotional distress and humiliation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

241.  Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

242.  Plaintiff requests relief as described in the Prayer for Relief below.

## FOURTH CAUSE OF ACTION

*Unlawful Discrimination on the basis of Religion in Violation of the New York State Human Rights Law*

243. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint as if set forth in full.

244.  Defendant's conduct as herein alleged violates the New York State Human Rights Law ("HRL") which makes unlawful, discrimination against employee on the basis of religion.

245. Defendant discriminated against Plaintiff in violation of HRL when, among other things, in direct response to and substantially motivated by Kinowski having expressed her sincerely held religious beliefs, Defendant planned to terminate Kinowski; to achieve this end, Defendant hired a consultant to manufacture and create a case against Kinowski for alleged misconduct; Defendant then hired a law firm to adopt and sign off on the consultant's findings doing all of this in an effort to cover up Defendant's discriminatory animus; and then Defendant summarily fired Kinowski ostensibly relying on the consultant's findings and the law firm's investigative report.

246.  As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered and continues to suffer, among other things, the loss of her rights, loss of salary and employment benefits, mental anguish, emotional distress and humiliation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

31

247. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

248. Plaintiff requests relief as described in the Prayer for Relief below.

## FIFTH CAUSE OF ACTION

*Unlawful Discrimination on the basis of Reprisal for Engaging in Protected Activities in Violation of the New York State Human Rights Law*

249. Plaintiff repeats and realleges each and every previous allegation contained in the First Amended Complaint as if set forth in full.

250. The Defendant's conduct as herein alleged violates the NYS HRL, which makes it unlawful for an employer to retaliate against an employee because she engaged in activities protected by HRL.

251. Defendant discriminated against Plaintiff in violation of HRL when, among other things, in direct response to and substantially motivated by Kinowski having expressed her sincerely held religious beliefs and requesting a religious exemption, Defendant planned to terminate Kinowski; to achieve this end, Defendant hired a consultant to manufacture and create a case against Kinowski for alleged misconduct; Defendant then hired a law firm to adopt and sign off on the consultant's findings doing all of this in an effort to cover up Defendant's discriminatory and retaliatory animus; and then Defendant summarily fired Kinowski ostensibly relying on the consultant's findings and the law firm's investigative report.

252. The stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to conceal the Defendant's discriminatory and retaliatory animus.

253. As a proximate result of Defendant's discriminatory and retaliatory actions, Plaintiff has suffered and continues to suffer, among other things, the loss of her rights,

32

loss of salary and employment benefits, mental anguish, emotional distress and humiliation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

254. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

255. Plaintiff requests relief as described in the Prayer for Relief below.

## SIXTH CAUSE OF ACTION

*Unlawful Discrimination on the Basis of Disparate Treatment on the Basis of Religion in Violation of the New York State Human Rights Law*

256. Plaintiff repeats and realleges each and every previous allegation contained in this Complaint as if set forth in full.

257. The Defendant's conduct as herein alleged violates NYS HRL, which makes it unlawful for an employer to discriminate against an employee because of her religion.

258. Defendant discriminated against Plaintiff when, among other things, it treated her differently than other employees who did not express a sincerely held religious belief that prohibited them from receiving a Covid-19 vaccine. Namely, Defendant treated Plaintiff differently by deploying a consultant to conduct a surreptitious investigation into Plaintiff for alleged misconduct and predetermining her fate to be immediate termination. Employees who initially requested a religious exemption from the Covid-19 vaccine requirement were not investigated and terminated like Kinowski because said employees either resigned or capitulated with respect to receiving a Covid-19 vaccine. The stated reasons for the Defendant's conduct were not the true reasons, but instead were a pretext to conceal the Defendant's discriminatory animus.

33

259. As a proximate result of Defendant's discriminatory actions, Plaintiff has suffered and continues to suffer, among other things, the loss of her rights, loss of salary and employment benefits, mental anguish, emotional distress, and humiliation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

260. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

261. Plaintiff requests relief as described in the Prayer for Relief below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Elizabeth Kinowski respectfully requests that this Court:

A. Enter a declaratory judgment that the practices complained of in this Complaint are unlawful and violate Title VII of the Civil Rights Act of 1964 and the New York State Human Rights Law.

B. Order Defendant to pay compensatory damages for Plaintiff's emotional pain and suffering, loss of employment compensation and benefits, among other things, in an amount to be proven at trial;

C. Order defendants to pay exemplary, nominal and punitive damages;

D. Order Defendants to pay attorneys' fees and costs of this action as provided by 42 U.S.C. §§ 1988 and 2000e-5(k) and other law (including expert fees, disbursements and other expenses related to this lawsuit);

E. Award such other and further relief as the Court deems necessary, just, proper and equitable.

## JURY DEMAND

Plaintiffs hereby request a trial by jury for all issues so triable in conformity with

Rule 38(b) of the Federal Rules of Civil Procedure.

Dated: December 13, 2022
Albany, NY

GALARNEAU LAW FIRM PLLC
/s/_Eric Galarneau
Eric Galarneau (Bar Roll No. 509248)
Counsel for Plaintiffs
41 State Street, Suite 604-17
Albany, NY 12207
P: 518.505.7002
Email: ericmgalarneauesq@gmail.com


MANDEL CLEMENTE, P.C.
/s Linda Mandel Clemente
Linda Mandel Clemente (Bar Roll No. 103535)
Counsel for Plaintiffs
77 Troy Road
East Greenbush, New York 12061
P: 518-283-9099
Email: Linda@mandelclemente.com



## DECLARATION OF PLAINTIFF

On this 13 day of December, 2022, I, Elizabeth Kinowski, pursuant to 28 U.S.C. §1746,

declares that she has read the foregoing and the same is true to her own knowledge,

except as to matters therein stated to be alleged on information and belief, and as to those

matters, she believes them to be true.

/s/Elizabeth Kinowski
Elizabeth Kinowski

35

# EXHIBIT A



# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Buffalo Local Office**
300 Pearl St, Suite 450
Buffalo, NY 14202
(716) 431-5007
Website:  www.eeoc.gov

## <u>DETERMINATION AND NOTICE OF RIGHTS</u>
(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 09/16/2022

**To:** Mrs. Elizabeth Kinowski
118 Cherrywood Drive
AMSTERDAM, NY 12010
Charge No: 525-2022-00420

EEOC Representative and email:    Jennifer Carlo
Lead Systemic Investigator
jennifer.carlo@eeoc.gov

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission,

Maureen C. Kielt
Digitally signed by Maureen C. Kielt
Date: 2022.09.16 18:30:48 -04'00'

Maureen C. Kielt, Director
Buffalo Local Office

**Cc:**
Paul Buehler
Bond, Schoeneck, & King, PLLC
22 CORPORATE WOODS BLVD STE 501
Albany, NY 12211

Colleen  Vincent
The Sara Jane Sanford Home for Women
69 Guy Park Ave
Amsterdam, NY 12010

Please retain this notice for your records.

Enclosure with EEOC Notice of Closure and Rights (01/22)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 525-2022-00420 to the District Director at Timothy Riera, 33 Whitehall St 5th Floor

New York, NY 10004.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

Enclosure with EEOC Notice of Closure and Rights (01/22)

You may request the charge file up to 90 days after receiving this Notice of Right to Sue.  After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.