**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

ELIZABETH KINOWSKI,

                                        Plaintiff,                    1:22-cv-1342 (BKS/DJS)

v.

THE HOME FOR ELDERLY WOMEN OF
MONTGOMERY COUNTY, INC., also known as Sarah
Jane Sanford Home,

                                        Defendant.

**Appearances:**

*For Plaintiff:*
Eric M. Galarneau
Galarneau Law Firm PLLC
41 State Street, Suite 604-17
Albany, NY 12207

Linda Mandel Clemente
Mandel Clemente, P.C.
77 Troy Road, Suite 1
East Greenbush, NY 12061

*For Defendant:*
Paul Buehler, III
Bond, Schoeneck & King, PLLC
22 Corporate Woods Boulevard, Suite 501
Albany, NY 12211

**Hon. Brenda K. Sannes, Chief United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

I.      **INTRODUCTION**

        Plaintiff Elizabeth Kinowski brings this employment discrimination action against her

former employer, The Home for Elderly Women of Montgomery County, Inc., also known as the

Sarah Jane Sanford Home ("Defendant" or "the Home"), alleging violations of Title VII of the

Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e et seq.; violations of New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law § 290 et seq.; defamation; and intentional and negligent infliction of emotional distress. (*See generally* Dkt. No. 9 (amended complaint)).[1] Presently before the Court is Defendant's motion to dismiss the amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. (Dkt. No. 15). The parties have filed responsive briefing. (Dkt. Nos. 16, 17). For the following reasons, Defendant's motion is granted in part and denied in part.

## II.    FACTS[2]

### A.    Background

Plaintiff is a licensed registered nurse and a "devout, practicing Roman-Catholic." (Dkt. No. 9, ¶ 15). She was employed by Defendant, "an adult home for people 65 and older" located in Amsterdam, New York, as its Administrator from October 2017 until her termination in October 2021. (*Id.* ¶¶ 1 n.1, 15, 17–18). Defendant has a Board of Trustees (the "Board") which is "responsible for overseeing the Home's fiscal situation and is charged with the duty of hiring and firing" and "imposing discipline" on the Administrator. (*Id.* ¶¶ 19–20). The Home also has a Board of Lady Managers, which is responsible for "overseeing and planning parties and celebrations that take place at the Home." (*Id.* ¶ 21).

As Administrator of the Home, Plaintiff was in charge of the Home's approximately 30 employees and was responsible for "all Home residents numbering between 22–40 during her tenure." (*Id.* ¶¶ 23–24). Plaintiff was also responsible for running the Home's day-to-day operations, "promulgating and implementing Home policies," and "meeting with and advising

---

[1] Plaintiff amended her complaint once as a matter of course in response to Defendant's motion to dismiss the original complaint. (*See* Dkt. Nos. 7, 9). Defendant withdrew that motion to dismiss. (Dkt. No. 13).

[2] The facts are drawn from the amended complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

the Boards on various matters regarding the Home." (*Id.* ¶ 25; *id.* ¶ 26 (alleging that, under the Home's bylaws, the Administrator was "solely responsible for making and implementing Home policy")). Plaintiff alleges that she was well-qualified to serve as the Home's Administrator and that, prior to the events underlying this lawsuit, "the Home viewed [Plaintiff] as an excellent Administrator." (*Id.* ¶¶ 27–31). As Administrator, Plaintiff was "largely responsible for leading the Home's response to the Covid-19 pandemic" and for the Home's success on two surveys conducted by the New York State Department of Health ("DOH") in 2020. (*Id.* ¶¶ 35–38). In March 2021, Defendant gave Plaintiff a $15,000 raise and a $15,000 bonus. (*Id.* ¶ 32). In July 2021, Plaintiff was selected to attend the Heroes' Awards ceremony and "accept an award on behalf of the Home for its service to the community during the Covid-19 pandemic." (*Id.* ¶ 34). Plaintiff alleges that the Home never disciplined, counseled, or censured her "in any way for poor job performance" or misconduct and that no resident, resident's family member, or employee ever made a complaint about her. (*Id.* ¶¶ 39–40).

### B.   The DOH Mandate and Plaintiff's Objection

In August 2021, DOH advised that it would be adopting regulations requiring employees in covered healthcare settings, including the Home, to receive a Covid-19 vaccine, with the regulations going into effect on August 26, 2021. (*Id.* ¶¶ 55–56). The regulations required covered entities to "continuously require personnel to be fully vaccinated against COVID-19" (the "DOH Mandate"). 10 N.Y.C.R.R. § 2.61(c) (Aug. 26, 2021). The regulations allowed for medical exemptions in certain circumstances but did not allow any religious exemptions. *See id.* § 2.61(c), (d).

Plaintiff arranged and attended a meeting with all members of the Board, which took place on August 24, 2021, to discuss "the Home's response to these regulations." (Dkt. No. 9, ¶¶ 57–59). Plaintiff "informed the Board" of the State's policy and stated that "she wished to

adopt Home policies that allowed employees to request exemptions [to the vaccination requirement], including religious exemptions." (*Id.* ¶ 60). She also told the Board that "she would like to submit a request for a religious exemption herself and stated her reasons" for the request, "including reference to express Biblical provisions which she, in good faith and religious conscience, believed required that she refuse to take the Covid vaccine." (*Id.* ¶ 61; *see also id.* ¶¶ 42–54 (describing Plaintiff's faith and the basis for her objection to the Covid-19 vaccine on religious grounds)).[3] Plaintiff then "attempted to hand in her written exemption request" to Kris Singh, the President of the Board, but Mr. Singh "declined to receive" the written request and said he "did not want 'to look at it right now.'" (*Id.* ¶¶ 63–64).

Although the Board "did not directly comment" on Plaintiff's statements, Mr. Singh's behavior toward Plaintiff "changed markedly" after the meeting. (*Id.* ¶¶ 67–68). Whereas Mr. Singh and other members of the Board had previously treated Plaintiff "amiably, with respect and professionalism," Mr. Singh "began to act bitterly, coldly and curtly" towards Plaintiff. (*Id.* ¶¶ 69–70). Mr. Singh and other Board members began to "deliberately exclude [Plaintiff] from multiple necessary meetings with the Board" that Plaintiff had always attended. (*Id.* ¶ 71). Plaintiff alleges that Board members "began to plan how they would terminate" her. (*Id.* ¶ 72).

### C.   Further Response to the Covid-19 Pandemic

On or about September 1, 2021, Plaintiff advised Home employees of the DOH Mandate. (*Id.* ¶ 76). Within a few days, Plaintiff received approximately 15 requests for religious exemptions from the DOH Mandate. (*Id.* ¶¶ 77–78). Plaintiff "arranged another meeting" with Board members to discuss these exemption requests and how the Home would respond, and she met with Mr. Singh and Board member William Sikora on September 3, 2021. (*Id.* ¶¶ 79–80).

---

[3] Neither the basis for Plaintiff's religious objection nor the sincerity of her beliefs is at issue on the present motion.

Plaintiff advised Mr. Singh and Mr. Sikora that "a number of employees requested a religious exemption" and offered to hand over the written requests, but Mr. Singh "declined and would not receive the requests." (*Id.* ¶¶ 81–83). Plaintiff also inquired whether the Home "should consider writing to elected representatives" about the DOH Mandate; Mr. Singh said "we'll do nothing of the kind" and that it was a "unanimous decision" of the Board not to write any elected representatives. (*Id.* ¶¶ 84–86). Plaintiff asked Mr. Singh "if all nine members of the Board" had "voted against this proposition." (*Id.* ¶ 89). Mr. Singh at first was silent but then stated that only the "executive members" of the Board had voted against the proposition. (*Id.* ¶¶ 90–91).

At the September 3 meeting, Mr. Singh also asked Plaintiff to "find a medical professional familiar with the Covid-19 vaccines to come in and educate staff about the vaccines." (*Id.* ¶ 92). Plaintiff agreed to do so; shortly after the meeting, she hired a doctor for the assignment and Mr. Singh "approved" of her decision. (*Id.* ¶¶ 93–95). The doctor came to the Home on September 15, 2021 and conducted an informal presentation for the approximately ten employees who attended, including Plaintiff. (*Id.* ¶¶ 97–98).

### D.    Hiring of Covid Consultant

On September 7, 2021, a resident of the Home advised Plaintiff that she had been told the Board found a "replacement" for Plaintiff. (*Id.* ¶ 108). When Plaintiff asked Board Treasurer Ben Ziskin about this information, Mr. Ziskin "initially responded that it was true, but then backtracked" and stated that the Board had hired someone as a "consultant" and "Covid coordinator." (*Id.* ¶¶ 109–10).[4] On September 7 or 8, Mr. Singh told Plaintiff that she was not being terminated or replaced by the Covid consultant. (*Id.* ¶¶ 118–19).

---

[4] Plaintiff alleges that the Board acted "unilaterally" in hiring a Covid consultant and that, although the Board "may vote to approve the hiring of a consultant," it "would never have acted unilaterally and certainly not without [Plaintiff's] knowledge or input prior to [Plaintiff's] expression of her religious views about the Covid vaccine." (*Id.* ¶¶ 112–16). Plaintiff alleges that the hiring of a Covid consultant was pretextual and part of the Board's plan to "deploy

The individual hired to be the Covid consultant, Jeanne So, was the prior administrator of the Home and had trained Plaintiff when Plaintiff was hired in 2017. (*Id.* ¶¶ 111, 122–24). Plaintiff alleges that Ms. So "was not held in high esteem by the residents" and Board of Lady Managers during her tenure as administrator, noting that, approximately one year after Ms. So's retirement, Plaintiff received a letter from a Lady Board member stating that Plaintiff had "breathed new life into the Sanford Home" and that "for the first time the residents have a voice thanks to [Plaintiff]." (*Id.* ¶¶ 125, 126 (emphasis omitted)). Further, Ms. So had inquired about an open position on the Board of Lady Managers following her retirement; when Plaintiff suggested that Ms. So "might have a conflict of interest" due to her prior tenure as administrator, the Board agreed and Ms. So was not appointed. (*Id.* ¶ 127). Plaintiff alleges that Ms. So had no special expertise in infectious disease or with Covid, or any other credential qualifying her to be a Covid consultant. (*Id.* ¶¶ 128–30).

After Ms. So began her duties as Covid consultant on September 9 or 10, 2021, she began "giving the Home employees administrative orders as well as attempting to directly implement Covid vaccine policies for the Home, bypassing [Plaintiff] entirely." (*Id.* ¶¶ 121, 133). Ms. So restricted unvaccinated employees from using the break room, posted signs in the Home communicating her "new rules," and "never consulted" with Plaintiff about the rules she was implementing. (*Id.* ¶¶ 134–36). On September 15, Plaintiff asked Ms. So to "pass any changes" she wanted to make through Plaintiff first, but Ms. So responded that she did not have to advise Plaintiff and "could institute changes without her approval." (*Id.* ¶¶ 137–38). When Plaintiff

the consultant to 'investigate' [Plaintiff] and to manufacture alleged grounds for her termination and replacement." (*Id.* ¶ 117).

6

discussed her concerns with Mr. Singh the next day, Mr. Singh told Plaintiff that she and Ms. So were "equals." (*Id.* ¶¶ 139–41).

On September 20, 2021, the Board issued a memorandum indicating that Ms. So's role was to "implement" the Home's Covid-19 vaccination policy and that Ms. So would be "taking all direction from the Board of Trustees." (*Id.* ¶ 144). The Home's stated Covid-19 vaccination policy required all employees to receive a Covid-19 vaccine, "without allowing for religious exemptions." (*Id.* ¶ 145). However, the memorandum stated that the Home would not enforce that part of the DOH Mandate that "barred religious exemptions" and that the Home could "not refuse to accept a request for a religious exemption at this time." (*Id.* ¶ 146). Plaintiff alleges that the Home's bylaws conferred the duty to make and implement policy upon the Administrator and therefore that the Board violated the bylaws by conferring the duty of implementing the Covid-19 vaccination policy on Ms. So. (*Id.* ¶¶ 147–48).

On September 8, 2021, Plaintiff emailed Mr. Singh a copy of her request for a religious exemption to the DOH Mandate. (*Id.* ¶ 166). Mr. Singh replied and asked for copies of the Home's bylaws and other documents but did not otherwise respond to her exemption request. (*Id.* ¶ 167). On September 14, 2021, United States District Judge David N. Hurd issued a temporary restraining order enjoining DOH from "enforcing any requirement that employers deny religious exemptions from COVID-19 vaccination or that they revoke any exemptions employers already granted." *Dr. A v. Hochul*, No. 21-cv-1009, 2021 WL 4189533, at *1, 2021 U.S. Dist. LEXIS 177761, at *3 (N.D.N.Y. Sept. 14, 2021).[5] On October 7, 2021, Plaintiff received a statement from the Board but signed by Ms. So which advised Plaintiff that the Board

---

[5] The Court takes judicial notice of "relevant matters of public record." *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012).

had "accepted" her request for a religious exemption "pending the outcome of federal litigation" and "subject to the review and approval by the Board." (Dkt. No. 9, ¶¶ 168–69). Subsequently, on October 12, Judge Hurd issued a preliminary injunction enjoining DOH from enforcing any requirement that employers deny religious exemptions to the DOH Mandate, finding that the plaintiffs had made a showing of a likelihood of success on the merits of their claims that the DOH Mandate violates the Free Exercise Clause of the First Amendment and is preempted by Title VII. *See generally Dr. A v. Hochul*, 567 F. Supp. 3d 362 (N.D.N.Y. 2021).

### E.   Investigation Into Plaintiff

Plaintiff alleges that Ms. So "proceeded to gather information" about Plaintiff, without Plaintiff's knowledge, throughout September and October 2021. (Dkt. No. 9, ¶ 150). Ms. So's investigation was "conducted at the express direction of members of the Board" and had the "pre-determined purpose of concocting a case of misconduct" against Plaintiff with the intention of firing her. (*Id.* ¶¶ 151–53). Ms. So asked residents for their opinions of Plaintiff, how Plaintiff treated them, and "whether they felt comfortable" around Plaintiff, all "with the intention of soliciting complaints." (*Id.* ¶¶ 154–55). Ms. So also spoke with family members of residents and Home employees regarding Plaintiff's conduct and asked the human resources office about Plaintiff's timesheets and time off. (*Id.* ¶¶ 157, 160, 162). Plaintiff alleges that prior to Ms. So's investigation, no residents, family members of residents, or employees had ever made any complaints against Plaintiff and that Plaintiff had no pattern of being late for work and had not violated the Home's time off policy. (*Id.* ¶¶ 156, 159, 161, 164). Neither the Board nor Ms. So informed Plaintiff that she was being investigated. (*Id.* ¶ 165).

On October 12, 2021, the Board hired a law firm to conduct its own investigation of Plaintiff. (*Id.* ¶¶ 170–71). Plaintiff alleges, however, that the law firm "conducted little to no independent investigation" outside of the information gathered by Ms. So and was hired to

"rubberstamp" Ms. So's findings. (*Id.* ¶¶ 172, 174). On October 19, 2021, Mr. Singh, Mr. Sikora, Board member Don Wilson, and the Board of Lady Managers co-presidents met with Plaintiff at the Home. (*Id.* ¶¶ 180–81). Mr. Singh informed Plaintiff that "he was placing her on administrative leave with pay" because the Home "was having an investigation conducted into her as a result of some alleged 'complaints.'" (*Id.* ¶ 182). Plaintiff asked if she would have an opportunity to be interviewed during the investigation, and Mr. Singh replied that she would be interviewed. (*Id.* ¶¶ 183–84). However, Plaintiff was never interviewed or given an opportunity to respond to the allegations made against her during the course of the law firm's investigation. (*Id.* ¶ 188).

### F.    Plaintiff's Termination

The Board fired Plaintiff on October 29, 2021. (*Id.* ¶ 200). Plaintiff's termination letter stated that the Board was terminating Plaintiff "based on 'information provided to the Boards by many residents and their families' which has 'created an environment where residents do not feel safe, comfortable, respected or cared for in their own home.'" (*Id.* ¶ 204). Plaintiff alleges that the Board "never reviewed" the law firm's subsequent investigative report, which was dated November 3, prior to her termination. (*Id.* ¶ 201; *id.* ¶ 203 (alleging that Mr. Sikora testified at a subsequent unemployment benefits appeal hearing that "he had never reviewed the investigative report")). The Board members "adopted the alleged facts and findings communicated to them" by Ms. So and the law firm and "deliberately failed to hear or consider any facts or evidence in [Plaintiff's] defense." (*Id.* ¶¶ 205–07). Plaintiff further alleges that the Home's policy, for "most forms of employee misconduct," requires that "the violating employee be confronted by [the employee's] supervisor with the alleged infraction" and be given notice of the discipline to be imposed, and that an employee can generally be fired "only after three warnings." (*Id.* ¶¶ 209–10). Plaintiff alleges that Defendant did not terminate any employee, other than Plaintiff, for

requesting a religious exemption to the DOH Mandate. (*Id.* ¶ 212). Plaintiff further alleges that Board members "believed that [Plaintiff] would not capitulate" in receiving the vaccine and "might inspire others to follow her example." (*Id.* ¶ 214).

Also on October 29, the Second Circuit heard oral argument on the appeals of Judge Hurd's preliminary injunction decision in *Dr. A* and a related case in which preliminary injunctive relief was denied. *See generally We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) ("*We the Patriots I*"). Following oral argument, the Second Circuit issued an order vacating the preliminary injunction and advised that a written opinion would follow; that written opinion was issued on November 4, 2021. *Id.* at 273. As relevant here, the court concluded that the plaintiffs had not shown a likelihood of success on the merits of their claim that Title VII preempted the DOH Mandate, because "Section 2.61, on its face, does not bar an employer from providing an employee with a reasonable accommodation that removes the individual from the scope of the Rule." *Id.* at 292. Title VII requires an employer to offer a reasonable accommodation that does not cause undue hardship but "does not require covered entities to provide" the employees' preferred accommodation of "a blanket religious exemption allowing them to continue working at their current positions unvaccinated." *Id.* The Second Circuit clarified its opinion on November 12, stating: "[I]t may be *possible* under the Rule for an employer to *accommodate*—not *exempt*—employees with religious objections, by employing them in a manner that removes them from the Rule's definition of 'personnel.'" *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 368, 370 (2d Cir. 2021) ("*We the Patriots II*").[6]

---

[6] Following the *We the Patriots* decisions, DOH issued a letter dated November 15, 2021 indicating that covered entities must ensure that personnel comply with the DOH Mandate by November 22, 2021. Letter from Jennifer L. Treacy, Deputy Director, Office of Primary Care & Health Systems Management, DOH (Nov. 15, 2021), *available at* https://www.health.ny.gov/professionals/hospital_administrator/letters/2021/docs/dal_21-11.pdf.

The law firm produced an investigative report dated November 3, 2021. (Dkt. No. 9, ¶ 187). The report claimed that Plaintiff "had engaged in poor behavior while the Administrator of the Home for years." (*Id.* ¶ 189). More specifically, the report contained allegations that Plaintiff "yelled at residents," "dismissed their concerns," made residents feel that their "rights and protections were violated," "engaged in favoritism," "did not attend meetings and was not available to receive suggestions or feedback," created a "toxic" and "unsafe" environment, allowed medication errors to occur, and was "consisten[tly] absent from the Home or inaccessible." (*Id.* ¶ 277). The report "in almost all instances fails to identify specific dates or even general time frames" when the alleged misconduct took place, and the individuals who provided the information are anonymous. (*Id.* ¶¶ 190–91). The report mentions no instances of prior complaints about Plaintiff or of prior discipline. (*Id.* ¶¶ 192–93). Plaintiff alleges that "[a]ll of the investigative report's purported facts alleging poor behavior . . . are either completely false or partially false" and are "inconsistent" with the Board's decisions to give Plaintiff a raise and bonus in March 2021 and allow Plaintiff to accept an award on behalf of the Home. (*Id.* ¶ 197). The investigative report recommended that the Board "immediately terminate" Plaintiff. (*Id.* ¶ 198).

### G.     Subsequent Events

Following her termination, Plaintiff applied for unemployment benefits with the New York State Department of Labor. (*Id.* ¶ 218). Plaintiff appealed the initial denial of her application, and the New York State Unemployment Insurance Appeal Board conducted an evidentiary hearing on May 31, 2022. (*Id.* ¶¶ 220–22). Mr. Sikora appeared at the hearing on behalf of the Home, and the law firm's investigative report was provided to the Appeal Board. (*Id.* ¶ 224). The Appeal Board reversed the initial determination and granted Plaintiff unemployment benefits. (*Id.* ¶ 226). The Appeal Board's written decision concluded that

Plaintiff's "actions were not so egregious as to rise to the level of misconduct" and "criticized" the investigation report. (*Id.* ¶¶ 227–28). The Appeal Board noted that Mr. Sikora, on behalf of the Home, "acknowledged they did not verify any of the information in the report" or "address any of the issues with [Plaintiff] prior to discharging her." (*Id.* ¶ 229). Further, it was "undisputed that there were no complaints for years about [Plaintiff] and that the Board gave her bonuses and raises for her work." (*Id.*).

In January 2023, Plaintiff "was being considered for a bookkeeper position for her Church." (*Id.* ¶ 283). "[C]ertain members of the Board verbally advised third parties within the Church community of the contents of the [investigative] report . . . in an effort to persuade those third parties not to hire [Plaintiff] as a bookkeeper." (*Id.*).

## III.   STANDARD OF REVIEW

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id.* (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   DISCUSSION

The amended complaint asserts nine causes of action for: unlawful discrimination on the basis of religion, disparate treatment, and retaliation in violation of Title VII; unlawful

discrimination on the basis of religion, disparate treatment, and retaliation in violation of

NYSHRL; defamation; intentional infliction of emotional distress; and negligent infliction of

emotional distress. (Dkt. No. 9, ¶¶ 234–98). Defendant moves to dismiss the amended complaint

in its entirety for failure to state a claim. (*See generally* Dkt. No. 15-1).

   A.    **Religious Discrimination Claims[7]**

   Defendant argues that Plaintiff's religious discrimination claims must be dismissed

because (1) the Second Circuit has "specifically held that Title VII does not entitle Plaintiff to an

exemption from the DOH Mandate" and (2) Plaintiff's requested accommodation of receiving an

exemption from the DOH Mandate would also pose an undue hardship by increasing

Defendant's safety risks. (Dkt. No. 15-1, at 13–19). Plaintiff responds that Title VII "does not

limit discrimination to the failure to accommodate a religious practice" and that she has plausibly

alleged the elements of a religious discrimination claim. (Dkt. No. 16, at 14–18).

   Title VII makes it unlawful for an employer "to discharge any individual, or otherwise to

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national

origin." 42 U.S.C. § 2000e-2(a)(1). The term "religion" is defined to include "all aspects of

religious observance and practice, as well as belief, unless an employer demonstrates that he is

unable to reasonably accommodate to an employee's . . . religious observance or practice without

undue hardship on the conduct of the employer's business." *Id.* § 2000e(j). To "properly assert" a

claim of discrimination under Title VII, a plaintiff must "allege two elements: (1) the employer

---

[7] "The standards for recovery under the [NYSHRL] are the same as the federal standards under title VII." *Forrest v. Jewish Guild for the Blind*, 819 N.E.2d 998, 1006 n.3 (N.Y. 2004); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107 n.7 (2d Cir. 2019) ("We typically treat Title VII and NYHRL discrimination claims as analytically identical, applying the same standard of proof to both claims." (quoting *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d. Cir. 2008))). The parties discuss Plaintiff's Title VII and NYSHRL discrimination claims together, and, except as otherwise noted below, the Court does as well.

discriminated against [her] (2) because of [her] race, color, religion, sex, or national origin." *Buon v. Spindler*, 65 F.4th 64, 78 (2d Cir. 2023) (quoting *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 85 (2d Cir. 2015)). At the motion to dismiss stage, and "absent direct evidence of discrimination," the complaint must plausibly allege that the plaintiff (1) "is a member of a protected class," (2) was qualified for the position, (3) suffered an adverse employment action, and (4) "has at least minimal support for the proposition that the employer was motivated by discriminatory intent." *Id.* at 79 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 311 (2d Cir. 2015)).

Here, as an initial matter, the Court rejects Defendant's argument that Plaintiff's religious discrimination claims are necessarily foreclosed by the *We the Patriots* decisions. Defendant may be correct that it was not obligated under Title VII to grant Plaintiff a religious exemption to the DOH Mandate, as other courts have held and which Plaintiff does not appear to dispute. *See, e.g., Dennison v. Bon Secours Charity Health Sys. Med. Grp., P.C.*, No. 22-cv-2929, 2023 WL 3467143, at *6, 2023 U.S. Dist. LEXIS 84888, at *15–16 (S.D.N.Y. May 15, 2023) (noting that granting the plaintiffs' requested exemption from the vaccination mandate would cause the defendants to violate the state regulations and therefore suffer an undue hardship, and collecting cases dismissing Title VII claims brought by plaintiffs seeking "blanket religious exemptions"). But that does not mean that Defendant could not discriminate against Plaintiff on the basis of religion in some other way. Stated differently, although Defendant argues that its "inability to grant [Plaintiff's] accommodation request" "inevitably would have resulted in her discharge," (Dkt. No. 17, at 9), that does not necessarily mean the inability to grant the exemption request was in fact the reason for Plaintiff's discharge. Indeed, Plaintiff alleges that Defendant's stated reason for her termination was not her accommodation request but misconduct which resulted in

"an environment where residents do not feel safe, comfortable, respected or cared for in their own home." (Dkt. No. 9, ¶ 204).[8] Thus, Plaintiff does not assert a failure-to-accommodate claim. *See also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 731 F.3d 1106, 1120 (10th Cir. 2013) (explaining that "[r]eligion-accommodation claims are a subset of the types of religion-discrimination claims that an applicant or employee may present under Title VII"), *rev'd on other grounds*, 575 U.S. 768 (2015).

Furthermore, the Court concludes that Plaintiff has alleged facts which plausibly provide "at least minimal support for the proposition that [Defendant] was motivated by discriminatory intent" in terminating her. *Buon*, 65 F.4th at 79.[9] Plaintiff alleges that, prior to expressing her religious beliefs and objections to the Covid-19 vaccine, she satisfactorily performed her duties as Administrator and the Boards recognized her good performance. Plaintiff received a raise and a bonus and was selected to receive an award on behalf of the Home, and there were never any complaints made against her. (Dkt. No. 9, ¶¶ 27–32, 34, 39–40). Shortly after Plaintiff voiced her religious beliefs, however, Mr. Singh began treating her coldly and she was excluded from Board meetings she normally attended. (*Id.* ¶¶ 67–71). Defendant then hired a Covid consultant who allegedly assumed some of Plaintiff's authority as Administrator and began investigating Plaintiff. (*Id.* ¶¶ 110, 133–41, 144–48, 150). Further, Plaintiff has plausibly alleged that the investigation into her was pretextual and designed to solicit complaints, given that Plaintiff had no prior complaints, the investigative report prepared by the law firm "rubberstamp[ed]" Ms.

---

[8] Citing cases with different procedural postures, Defendant notes that, assuming Plaintiff "can somehow demonstrate that the stated reason for her termination was false, she still must demonstrate that discrimination was the real reason to prevail." (Dkt. No. 15-1, at 14). However, to survive a motion to dismiss Plaintiff need only plausibly provide "minimal support" for the proposition that her termination was motivated by discriminatory intent. *Buon*, 65 F.4th at 79.

[9] Defendant makes no argument that Plaintiff has not plausibly alleged her membership in a protected class, that she was qualified to be the Administrator, or that she suffered an adverse employment action by being terminated.

So's findings and lacked any details, Plaintiff was not interviewed or otherwise given an opportunity to be heard during the investigation, and it is not clear that the Board in fact reviewed the investigative report before terminating Plaintiff. (*Id.* ¶¶ 172, 174, 188, 203). Finally, as alleged by Plaintiff, the timing of these events coincides with what was happening in the federal litigation surrounding the DOH Mandate. For example, the Board hired the law firm the same day a preliminary injunction was entered enjoining the state from enforcing any requirement that employers deny religious exemptions from Covid-19 vaccination, and Plaintiff was fired the same day the Second Circuit vacated that preliminary injunction. (*See id.* ¶¶ 170–71, 200); *supra* Section II.E, F. Accepting all of the factual allegations as true and drawing all reasonable inferences in Plaintiff's favor, the Court concludes that Plaintiff has plausibly alleged a minimal inference of discriminatory motivation based on "the sequence of events leading to [her] discharge." *Chukwueze v. NYCERS*, 891 F. Supp. 2d 443, 455 (S.D.N.Y. 2012) (noting that "a victim of discrimination . . . is usually constrained to rely on circumstantial evidence," such as the "sequence of events leading to the plaintiff's discharge" (citation omitted)).

Accordingly, the Court denies Defendant's motion to dismiss Plaintiff's religious discrimination claims.

### B.    Disparate Treatment Claims

In addition to her religious discrimination claims, Plaintiff asserts claims for "disparate treatment" on the basis of religion. (Dkt. No. 9, ¶¶ 249–54, 268–73). These claims appear to be premised on Defendant's "treat[ing] [Plaintiff] differently than other employees who did not express a sincerely held religious belief that prohibited them from receiving a Covid-19 vaccine" by surreptitiously investigating Plaintiff and "predetermining her fate to be termination." (*Id.* ¶¶ 250, 270). Defendant argues that (1) to the extent these claims are premised on Plaintiff's ultimate termination, they are duplicative of her religious discrimination claims, and (2) the

investigation and suspension with pay are not adverse employment actions. (Dkt. No. 15-1, at 20–21). Plaintiff responds that (1) the "discriminatory way" that Defendant pursued its investigation is "actionable" because it led to her discharge, which is undisputedly an adverse employment action, and (2) Defendant's investigation constitutes an adverse employment action because Defendant departed from its normal disciplinary policies and procedures. (Dkt. No. 16, at 23–25).

As an initial matter, the Court agrees with Defendant that, to the extent Plaintiff's disparate treatment claims rely on her termination, those claims are duplicative of her "religious discrimination" claims. *See Chin v. Port Authority of N.Y. & N.J.*, 685 F.3d 135, 151 (2d Cir. 2012) (listing the same four elements for an "individual disparate treatment claim"). The question is therefore whether Plaintiff has plausibly alleged that she was subjected to any adverse employment action in addition to her termination. An adverse employment action is a "materially adverse change in the terms and conditions of employment." *Buon*, 65 F.4th at 79 (citation and internal quotation marks omitted). An adverse employment action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)). Examples include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (citation and ellipses omitted).

The Second Circuit has held that "administrative leave with pay during the pendency of an investigation does not, without more, constitute an adverse employment action." *Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006); *see also Jaeger v. N. Babylon Union Free Sch. Dist.*, 191 F. Supp. 3d 215, 227 (E.D.N.Y. 2016) (noting that courts in this Circuit have held that

"investigations alone" are not adverse employment actions (citations omitted)). This is because "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances," and therefore an employee does not suffer "a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Joseph*, 465 F3d at 91. This rule is not absolute, however, and the relevant question is "whether the employer has simply applied reasonable disciplinary procedures . . . or if the employer has exceeded those procedures and thereby changed the terms and conditions of employment." *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012) (quoting *Joseph*, 465 F.3d at 92 n.1).

Here, the Court cannot say as a mater of law that the investigation into Plaintiff did not constitute an adverse employment action by exceeding Defendant's reasonable disciplinary procedures. Plaintiff alleges that the investigation into her was largely conducted not by human resources personnel or the law firm but by Ms. So, an individual hired to be a Covid consultant and who may have had preconceived notions about Plaintiff. Ms. So was the prior administrator of the Home, trained Plaintiff when she was hired, and was not appointed to the Board of Lady Managers based on Plaintiff's recommendation. (Dkt. No. 9, ¶¶ 111, 122–27). Plaintiff also alleges that she was not interviewed during the course of the investigation and that the law firm simply rubberstamped Ms. So's information. (*Id.* ¶¶ 188, 190–93 (alleging that the law firm's report largely fails to identify the time frame of alleged misconduct or the individuals providing the information)). Further, Plaintiff alleges that Defendant's policy, "for most forms of employee misconduct," requires that the employee be "confronted by [the employee's] supervisor with the alleged infraction" and notified "of the discipline to be imposed." (*Id.* ¶ 209). The policy also

requires, for most forms of misconduct, "three warnings" before an employee can be terminated. (*Id.* ¶ 210). Thus, at this stage the Court cannot say that Defendant "simply applied" its usual disciplinary procedures, *Brown*, 673 F.3d at 150, and Plaintiff's disparate treatment claims may proceed to the extent they are premised on the investigation.

### C.    Retaliation Claims

For a Title VII retaliation claim to survive a motion to dismiss, "the plaintiff must plausibly allege that: (1) defendants discriminated—or took an adverse employment action—against [her], (2) 'because' [s]he has opposed any unlawful employment practice." *Vega*, 801 F.3d at 90. Generally, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)). To plead causation, the plaintiff must plausibly allege that the retaliation was the "but-for" cause of the employer's adverse action, i.e., that "the adverse action would not have occurred in the absence of the retaliatory motive." *Id.* at 90–91 (quoting *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013)). Causation can be demonstrated either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Hicks v. Baines*, 593 F.3d 159, 170 (2d Cir. 2010) (quoting *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).

### 1.      Protected Activity Under the NYSHRL

Defendant argues that Plaintiff's NYSHRL retaliation claim must be dismissed because Plaintiff has not engaged in any protected activity. (Dkt. No. 15-1, at 22–23).[10] Plaintiff responds that her "religious-based opposition to the DOH mandate" is protected activity. (Dkt. No. 16, at 19–21).

The NYSHRL prohibits retaliation "against any person because he or she has opposed any practices forbidden under [the NYSHRL] or because he or she has filed a complaint, testified or assisted in any proceeding under [the NYSHRL]." N.Y. Exec. Law § 296(7). As Defendant argues, New York courts have held that requesting a religious accommodation is not protected activity under the NYSHRL because such a request does not involve opposing an unlawful employment practice or participating in a proceeding. *See, e.g.*, *Giblin v. LeMoyne Coll.*, No. 20-cv-477, 2021 WL 781363, at *15, 2021 U.S. Dist. LEXIS 37235, at *42–43 (N.D.N.Y. Mar. 1, 2021) ("[R]equesting an accommodation is not protected activity under the NYHRL." (citations omitted)); *D'Amico v. City of New York*, 73 N.Y.S.3d 540, 541 (1st Dep't 2018) (same); *McKenzie v. Meridian Cap. Grp., LLC*, 829 N.Y.S.2d 129, 131 (2d Dep't 2006) (concluding that accommodation request did not involve "opposition to a practice forbidden by" the NYSHRL).

Although Plaintiff does not argue that her request for a religious accommodation constitutes protected activity under NYSHRL, Plaintiff suggests that she engaged in protected activity by expressing her "religious-based opposition to the DOH mandate." (Dkt. No. 16, at 19;

---

[10] Although the Second Circuit has not expressly determined whether a request for a religious accommodation constitutes "protected activity" for purposes of a Title VII retaliation claim, District Courts in this Circuit have held that it does. *See, e.g.*, *Levy v. Legal Aid Soc.*, 408 F. Supp. 3d 209, 216–17 (E.D.N.Y. 2019) (citing *Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 473 (S.D.N.Y. 2009)); *Chavis v. Wal-Mart Stores, Inc.*, 265 F. Supp. 3d 391, 407 n.6 (S.D.N.Y. 2017) ("Courts in this District have held that a request for a religious accommodation itself constitutes protected activity for purposes of a Title VII retaliation claim, citing the rule in this Circuit that requests for disability accommodations are protected activity under the Americans with Disabilities Act."). For purposes of the present motion, Defendant does not appear to contest that requesting a religious accommodation constitutes protected activity under Title VII. (*See* Dkt. No. 15-1, at 19–20 (referencing Plaintiff's request for a "religious exemption")).

*id.* at 21 (noting that Plaintiff "opposed the mandate on religious grounds in September and October")). Plaintiff does not, however, cite any authority to support the proposition that opposition to a government regulation is the equivalent of opposition to "an unlawful employment practice" of her employer. 42 U.S.C. § 2000e–3(a); *see Leroy v. Delta Air Lines*, No. 21-cv-267, 2022 WL 12144507, at *5, 2022 U.S. App. LEXIS 29352, at *13 (2d Cir. Oct. 27, 2022) (analyzing whether "a reasonable similarly situated person would have a good-faith, reasonable belief that [the employer] was engaged in an unlawful employment practice"); *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 134 (2d Cir. 1999) (noting that the plaintiff must have a "good faith, reasonable belief that the underlying actions *of the employer* violated the law" (emphasis added)). Further, contrary to Plaintiff's suggestion, the relevant issue in *We the Patriots* was not whether the DOH Mandate violated Title VII, but rather whether the plaintiffs were likely to show that the DOH Mandate violated the Free Exercise Clause of the First Amendment and/or was preempted by Title VII. *See generally We the Patriots I*, 17 F.4th 266. Thus, the Court concludes that Plaintiff has not plausibly alleged that she engaged in protected activity for purposes of her NYSHRL retaliation claim, and that claim is dismissed.

### 2. *We the Patriots*

Defendant argues that Plaintiff's Title VII retaliation claim is foreclosed by the *We the Patriots* decisions because Defendant could not grant Plaintiff the blanket religious exemption she requested. (Dkt. No. 15-1, at 19–20; Dkt. No. 17, at 9). Plaintiff responds that "retaliatory acts involve more than discharge" and encompass the investigation conducted into Plaintiff. (Dkt. No. 16, at 20).

As with Plaintiff's religious discrimination claims, the Court concludes that Defendant's inability to grant a blanket exemption to the DOH Mandate does not foreclose Plaintiff's retaliation claim. *Supra* Section IV.A. Even if Plaintiff *ultimately* would have been terminated

for her failure to receive a Covid-19 vaccine and Defendant's inability to grant her an exemption without violating the DOH Mandate, that does not necessarily shed light on the *actual motivation* for Defendant's actions. Further, as Plaintiff points out, her retaliation claim is premised on actions Defendant took short of terminating her, including the alleged pretextual investigation. In the context of a Title VII retaliation claim, an adverse employment action is any action that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Vega*, 801 F.3d at 90 (citation omitted). "This definition covers a broader range of conduct than does the adverse-action standard for claims of discrimination under Title VII" and is "not limited to discriminatory actions that affect the terms and conditions of employment." *Id.* (quoting *White*, 548 U.S. at 64). Thus, Defendant has not met its burden of demonstrating that dismissal of Plaintiff's Title VII retaliation claim is warranted.

### D.      Defamation Claim

Defendant moves to dismiss Plaintiff's defamation claim on the grounds that (1) the submission of the investigative report to the Insurance Appeal Board was absolutely privileged, and (2) Plaintiff has not otherwise adequately pleaded sufficient facts to state a defamation claim based on statements made to a prospective employer. (Dkt. No. 15-1, at 23–25). Plaintiff responds that (1) the investigative report is entitled only to a qualified privilege and was not pertinent to the unemployment proceedings, and (2) the amended complaint contains sufficient factual details regarding statements made to a prospective employer. (Dkt. No. 16, at 27–28).

### 1.      Submission of Investigative Report in Unemployment Proceedings

In New York, "[d]efamation is 'the making of a false statement which tends to expose the plaintiff to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society.'" *Stepanov v. Dow Jones & Co.*, 120 A.D.3d 28, 34 (1st Dep't 2014) (quoting *Foster v. Churchill*,

665 N.E.2d 153, 157 (N.Y. 1996)). To state a defamation claim, a plaintiff must allege: "(1) a false statement that is (2) published to a third party (3) without privilege or authorization, and that (4) causes harm, unless the statement is one of the types of publications actionable regardless of harm." *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017) (citation omitted). Absolute privilege is afforded to communications made by "individuals participating in a public function, such as judicial, legislative, or executive proceedings." *Stega v. N.Y. Downtown Hosp.*, 107 N.E.3d 543, 549 (N.Y. 2018) (citation omitted). Thus, statements "uttered in the course of a judicial proceeding are absolutely privileged, 'as long as such statements are material and pertinent to the questions involved.'" *Id.* (citation omitted). A statement receives only a qualified privilege, on the other hand, when it "is fairly made by a person in the discharge of some public or private duty, legal or moral, or in the conduct of his own affairs, in a matter where his [or her] interest is concerned." *Id.* (citation omitted). Such statements are protected if they are not made with malice, i.e., with "spite or ill will" or "reckless disregard" of whether the statements were false. *Id.* (citation omitted).

Absolute privilege extends to quasi-judicial proceedings conducted by administrative bodies so long as there is an available "mechanism for the party alleging defamation to challenge the allegedly false and defamatory statements." *Id.* at 550–51 (noting that absolute privilege will apply to proceedings in which both parties are entitled to participate) (citing *Toker v. Pollak*, 376 N.E.2d 163, 168 (N.Y. 1978)); *see also Arya v. Ensil Technical Servs., Inc.*, No. 12-cv-925S, 2012 WL 6690326, at *4, 2012 U.S. Dist. LEXIS 181038, at *10–12 (W.D.N.Y. Dec. 19, 2012) (collecting cases for the proposition that absolute privilege attaches to allegedly defamatory statements made to administrative agencies). Plaintiff does not dispute that statements made during the course of her unemployment insurance proceedings before the Department of Labor

would, if pertinent, be subject to an absolute privilege. *See, e.g.*, *Seymour v. N.Y. State Elec. & Gas Corp.*, 627 N.Y.S.2d 466, 468 (3d Dep't 1995) (rejecting argument that no privilege attached to allegedly defamatory written statement made "in the context of [an individual's] application for unemployment benefits"); *Phillip v. Sterling Home Care, Inc.*, 959 N.Y.S.2d 546, 547 (2d Dep't 2013) ("The statements the defendants made to the [Department of Labor] in connection with the plaintiff's application for unemployment benefits were absolutely privileged." (citations omitted)); *Ashe v. Mohawk Valley Nursing Home, Inc.*, 701 N.Y.S.2d 536, 537 (4th Dep't 1999) (same).

However, Plaintiff argues that the allegedly defamatory statements in the investigative report are subject only to a qualified privilege because the report "was prepared in advance of any litigation." (Dkt. No. 16, at 27). Plaintiff cites *Front v. Khalil*, in which the Court of Appeals held that "statements made prior to the commencement of an anticipated litigation are privileged, and that the privilege is lost where a [plaintiff] proves that the statements were not pertinent to a good faith anticipated litigation." 28 N.E.3d 15, 19 (N.Y. 2015). However, *Front* is inapposite as it involved letters written by an attorney summarizing potential claims and sent to a third party prior to the filing of any litigation. *See generally id.* Here, however, even though the investigative report was prepared prior to any judicial or quasi-judicial proceeding, the report was only sent to a third party, i.e. published, for the first time in the context of the unemployment proceedings. Because defamation requires publication of a statement to a third party, it stands to reason that a privilege attaches to a particular publication. *See Andrews v. Hansford Mfg. Corp.*, No. 4641/00, 2002 WL 193139, at *3, 2002 N.Y. Misc. LEXIS 102, at *9–10 (N.Y. Sup. Ct. Monroe Cty. Jan. 22, 2022) (rejecting the plaintiff's "attempts to distinguish between statements

prepared for submission to an administrative agency, and statements previously prepared . . . and then later[] submitted to an agency").

Plaintiff further argues that the investigative report was "wholly immaterial and impertinent" to the unemployment proceedings because the report "was not in existence at the time of termination and the Board thus could not have, and did not, reply upon it in terminating [her]." (Dkt. No. 16, at 27). However, even accepting Plaintiff's allegation that the Board did not rely on the investigative report at the time of her termination, the report is still broadly relevant to the question of whether Plaintiff engaged in misconduct, one of the issues before the Appeal Board. *See* N.Y. Labor Law § 593(3). Accordingly, the Court concludes that the submission of the investigative report to the Appeal Board is subject to an absolute privilege and grants Defendant's motion to dismiss Plaintiff's defamation claim based on this publication.

### 2.      Statements Made to Prospective Employer

Plaintiff alleges that, when she was being considered for a bookkeeper position for her Church and a neighboring parish in January 2023, "certain members of the Board verbally advised third parties within the Church community of the contents of the [investigative] report, and So's allegations relied upon therein, in an effort to persuade those third parties not to hire [Plaintiff]." (Dkt. No. 9, ¶ 283). Defendant argues that Plaintiff has not adequately pleaded a defamation claim because she has not identified the alleged defamatory statements, the speaker, or the recipient of the statements. (Dkt. No. 15-1, at 25). Plaintiff responds that she has stated a defamation claim by identifying the speaker as a Board member[11] and the recipient as third

---

[11] Plaintiff's opposition names a particular Board member who allegedly published defamatory statements in January 2023, (Dkt. No. 16, at 28), but this allegation is not contained in the amended complaint and the Court does not consider it. *See Sibley v. Watches*, 460 F. Supp. 3d 302, 317 (W.D.N.Y. 2020) ("[I]t is axiomatic that a complaint cannot be amended by the briefs in opposition to a motion to dismiss." (citations omitted)).

parties within the Church community, and because the amended complaint elsewhere quotes "the actual defamatory statements" of the investigative report. (Dkt. No. 16, at 28).

For a defamation claim to survive a motion to dismiss, a plaintiff must "identify (1) the allegedly defamatory statements; (2) the person who made the statements; (3) the time when the statements were made; and[] (4) the third parties to whom the statements were published." *Murphy v. Onondaga Cnty.*, No. 18-cv-1218, 2022 WL 819281, at *14, 2022 U.S. Dist. LEXIS 48996, at *37 (N.D.N.Y. Mar. 18, 2022) (citation omitted).[12] Defendant argues that Plaintiff's "cursory" allegations fail to identify the defamatory statements at issue, the speaker of the statements, or the recipient. (Dkt. No. 15-1, at 25). Plaintiff's defamation claim is premised on disclosure of "the contents of the [investigative] report, and So's allegations relied upon therein." (Dkt. No. 9, ¶ 283). Although this allegation, alone, might be insufficient to plausibly allege the defamatory statements at issue, the amended complaint elsewhere quotes from the investigative report statements which may plausibly be considered defamatory false statements of fact. (*See id.* ¶ 277 (alleging that the investigative report included allegations that, for example, Plaintiff "yelled at residents," "allowed medication errors to occur," and was "consisten[tly] absent from the Home or inaccessible"); *id.* ¶ 197 (alleging that the "facts alleging poor behavior" in the investigative report "are either completely false or partially false")). Thus, the Court concludes that Plaintiff has sufficiently identified the allegedly defamatory statements at issue. *Cf. Sebastiani v. Brooklyn Hosp. Ctr.*, No. 19-cv-253, 2019 WL 3281010, at *4–5, 2019 U.S. Dist. LEXIS 120872, at *12–14 (E.D.N.Y. July 19, 2019) (holding that the plaintiff had sufficiently alleged the defamatory statements at issue by alleging that the defendants made statements

---

[12] "Although the New York Civil Practice Law and Rules . . . requires a defamation plaintiff to plead the words of the purported defamation with particularity, that procedural requirement does not govern in federal court." *Germain v. M&T Bank Corp.*, 111 F. Supp. 3d 506, 537 (S.D.N.Y. 2015) (citation omitted); *see* N.Y. C.P.L.R. 3016(a).

concerning "knowingly false allegations that the Plaintiff had engaged in fraudulent billing practices and/or worked outside the scope of his practice while at [Brooklyn Hospital Center]").

By contrast, the Court concludes that Plaintiff has not plausibly alleged the speaker of the alleged defamatory statements or the third-party recipient. Plaintiff alleges that the statements at issue were made by "certain members of the Board." (Dkt. No. 9, ¶ 283). The amended complaint indicates that the Board has nine members, (*id.* ¶ 89), and Plaintiff's reference to "certain members" of the Board does not put Defendant on notice of which member or members made the statements at issue. *Cf. Simons v. New York*, 472 F. Supp. 2d 253, 267–68 (N.D.N.Y. 2007) (holding that the plaintiffs had not "identified the speaker" of the alleged defamatory statements where the plaintiff alleged that "defendants told the media" certain statements); *Regal Custom Clothiers, Ltd. v. Mohan's Custom Tailors, Inc.*, No. 96-cv-6320, 1997 WL 370595, at *8, 1997 U.S. Dist. LEXIS 9288, at *22 (S.D.N.Y. July 1, 1997) (finding it "not clear who [wa]s alleged to have made the defamatory statements" where the complaint alleged that "Defendants" made the defamatory statements but the plaintiff's memorandum of law referred only to alleged defamatory statements made by one defendant).[13] Nor does Plaintiff's reference to "third parties within the Church community" sufficiently identify the third parties to whom the statements were published: Plaintiff does not identify her church or parish or give any other indication as to who the third parties within that community might be. *Cf. Sebastiani*, 2019 WL 3281010, at *5– 6, 2019 U.S. Dist. LEXIS 120872, at *12–15 (dismissing defamation claim where the plaintiff

---

[13] Further, under New York law, "[a] corporation may be held liable for defamatory utterances made by its officer or agent, acting within the scope of [her] authority." *Mirage Ent., Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 36 (S.D.N.Y. 2018) (citation omitted); *see also Hammond v. Equinox Holdings LLC*, 148 N.Y.S.3d 34, 36 (1st Dep't 2021) (noting that a corporation-employer could not be held liable for the allegedly defamatory statement of its employee if the employee "was not acting within the scope of his employment when he made the statement" (citations omitted)). Although Defendant argues that Plaintiff has not alleged "any basis for attributing" the Board members' statements to Defendant, (Dkt. No. 17, at 13), the Court does not rely for dismissal on this argument, which was raised for the first time in Defendant's reply brief.

alleged that defendants made defamatory statements to the "other residency program" but did not identify that program).

Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's defamation claim.

### E.      Intentional and Negligent Infliction of Emotional Distress Claims

Defendant moves to dismiss Plaintiff's intentional infliction of emotional distress and negligent infliction of emotional distress claims on the grounds that (1) the intentional infliction of emotional distress claim is time-barred, (2) neither claim is adequately pled, and (3) the claims are duplicative of Plaintiff's other claims. (Dkt. No. 15-1, at 26–29). Plaintiff responds that (1) her claims are not time-barred because they "do not solely relate to the discrimination and termination of [Plaintiff], but also to the extreme and outrageous conduct of the Board that has continued through January 2023 and to date," and (2) the claims should not be deemed duplicative "in the event that any of the other causes of action are dismissed." (Dkt. No. 16, at 28–29).

Under New York law, the tort of intentional infliction of emotional distress has four elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Grice v. McMurdy*, 498 F. Supp. 3d 400, 414 (W.D.N.Y. 2020) (citation omitted). New York "sets a high threshold for conduct that is 'extreme and outrageous,'" *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996), and the conduct at issue must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society," *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993)). To state a negligent infliction of emotional distress claim, a plaintiff must allege "(1) a breach of a duty

owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021) (citations omitted). To establish the fourth element, a plaintiff "generally must plead that the breach endangered his physical safety or caused him to fear for his physical safety." *Id.* at 81 n.57 (citation omitted).

Here, the Court concludes that Plaintiff has not plausibly alleged an intentional infliction of emotional distress claim because Plaintiff has not alleged any conduct which meets the high bar of being "extreme and outrageous." "Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain" an intentional infliction of emotional distress claim because such conduct "is not sufficiently outrageous." *Semper v. N.Y. Methodist Hosp.*, 786 F. Supp. 2d 566, 587 (E.D.N.Y. 2011) (citation omitted).[14] Nor has Plaintiff alleged any facts "detailing [Defendant's] intent to cause severe emotional distress." *Grice*, 498 F. Supp. 3d at 414. Similarly, Plaintiff has not plausibly alleged a negligent infliction of emotional distress claim because, even assuming Plaintiff could plead that Defendant owed her some duty, she has not alleged any facts suggesting that any breach of that duty unreasonably endangered Plaintiff's physical safety or caused her to fear for her own safety. *Cf. Chiesa v. McGregor*, 176 N.Y.S.3d 687, 691 (2d Dep't 2022).

Accordingly, the Court grants Defendant's motion to dismiss Plaintiff's intentional and negligent infliction of emotional distress claims and does not reach Defendant's other arguments for dismissal.

---

[14] Further, New York courts are "reluctant" to allow intentional infliction of emotional distress claims in employment discrimination cases because courts are "wary of allowing plaintiffs to recharacterize claims for wrongful or abusive discharge" as claims for intentional infliction of emotional distress. *Semper*, 786 F. Supp. 2d at 587 (citation omitted).

V.     **CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendant The Home for Elderly Women of Montgomery County,

Inc.'s motion to dismiss (Dkt. No. 15) is **GRANTED in part**; and it is further

**ORDERED** that Plaintiff's claims for retaliation under the NYSHRL, defamation,

intentional infliction of emotional distress, and negligent infliction of emotional distress are

**DISMISSED with prejudice**; and it is further

**ORDERED** that Defendant's motion to dismiss (Dkt. No. 15) is otherwise **DENIED**.

**IT IS SO ORDERED.**

Dated:  July 31, 2023
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge